Mardiros M. Stone
vs.                          No.56682
National Asbestos Mfg. Co.
January 13, 1926

HAHN, J. This is an action to recover damages arising through the use of alleged defective asbestos shingles, manufactured by the defendant and sold through a Providence dealer, and applied to the roof by the Matthews Roofing Company.

The plaintiff's claim is based upon a guarantee issued by defendant which was delivered to him by the Matthews Roofing Company, which guarantee was supplemented by an additional guarantee, these guarantees being marked Exhibits 2 and 3.

Shortly after the job had been completed, some of the shingles blew off the roof and a conference and inspection took place (Transcript pp 189-190) to determine the trouble. Mr. Scharawath, representing the defendant, was present and although he states that in his opinion the shingles had not been properly nailed (Transcript 191), it appears that he did not call this matter to the attention of the plaintiff, but told Mr. Matthews of it. In view of the short lapse of

time between the completion of the work and the development of the trouble, it would seem probable that the cause would most likely be found in the method of application of the shingles, since, unless the shingles were obviously defective at the time of application, sufficient time had hardly elapsed for defects to have manifested themselves to the extent of the trouble shown, i. e., shingles blown off the roof. It seems highly improbable that any manufacturer would put out a shingle incapable of lasting a single month in use, when properly applied.

However, the defendant made no great point of this improper nailing at the time and did not bring it to the attention of the plaintiff, but on the contrary furnished new shingles for repairing the damage; one side of the roof was re-shingled, (Transcript p. 192), and secured the Matthews Roofing Company to put them on. Defendant's representative testified (Transcript pp. 223-234): ' I simply said we would send up the shingles, you put them on and send us the bill." This statement and conduct is wholly inconsistent with defendant's present claim, so that even if the nailing was poorly done defendant is apparently estopped from asserting it.

"A person is estopped to set up the truth in contradiction to his conduct, so as to make the truth an instrument of fraud."
East Greenwich, etc., v. Kenyon, 20 R. I. 110, 113.

In the following case the facts showed that a house which had been newly painted soon developed blisters, or "blubbers," in the paint, and the painter's excuse or explanation was that moisture in the walls was driven out by the plasterers building a fire within the house and this moisture lifted the paint. It appeared, however, that the painter was present and knew of the building of the fire at the time, and made no objec-

tion, and the court evidently considered this as inconsistent with his subsequent claim.

"He was there when the furnace or heating apparatus was put in, when the fire was started and during its continuance, and, so far as appears, he offered no objection and made no suggestion * * * that any injury would result to the painting which he had done by the heat or from the lack of heat."
King vs. Moore & Allan, 61 N. Y. App. Div. 609, 610.

Similarly, it was held that a telephone company had no right to say that one of its cables was not properly handled by city laborers, where it appeared that the president of the company passed from four to six times a day along the street where the work was being done and made no objection to the manner in which it was being done.
Reynolds Tel. Co. vs. City, 152 Mo. App. 361, 366.

In the above instance, the president was not at the scene for the purpose of inspection, but merely passed along, while in the present case defendant's president or representative spent at least some time on the roof for the express purpose of inspection, and made no complaint of the nailing to the plaintiff, Mr. Stone; if he did complain to Mr. Matthews, he at least could not have thought the nailing seriously defective or he would not have hired the same roofer to repair it, or paid him to do it; nor does it seem probable that he would have given the additional guarantee—the new shingles might well blow off if similarly defectively nailed. And there was the rest of the roof to be thought of. If the nailing was seriously wrong, more trouble might be anticipated from time to time and defendant would appear to be flying in the face of Providence in merely try-

ing to correct the limited damage already done (and at its own expense) and in issuing an additional guarantee as to the new work done by the same roofers, even though such guarantee was confined to defects of workmanship or material in the shingles.

The "business reasons" (Transcript p. 193, etc.), which may have impelled the defendant to take the course it did, however excellent in themselves, can not be allowed to prejudice plaintiff's position in the matter. If the shingles were all right and the nailing all wrong, he was entitled to know of it, and if defendant thought best for business reasons to let the matter rest between itself and Mr. Matthews, it must abide by that judgment.

However, the testimony as to improper nailing is not very conclusive in any event. Mr. Scharawath testified (Transcript p. 208) that he did not see any of the nails actually used but judged their size heads from the apertures in the shingles blown off. This presupposes that the particular shingles examined blew off leaving the nails in the roof, whereas the nails might have pulled out or broken off instead of pulling through the shingles. There is nothing to show conclusively the actual facts in the particular instance. Moreover, the man who put on plaintiff's new roof testified (Transcript p. 94 and 97) that he judged the nails which he saw and pulled out to be from ⅜ to ½ inch across the heads, and defendant specified 7-16, so that the variation thus shown is not substantial; not even alarmingly different if area rather than diameter be considered. A reasonable factor of safety in the strength and make-up of the shingle would seemingly take care of any small variation, such as shown, and it is not to be supposed that a roofer would use an obviously too small or defective nail. As to the number and placing of the nails, it is impossible to conclude definitely that the whole roof was improperly nailed because some few shingles apparently showed defective nailing. It may well be that conditions do not always permit of nailing every shingle alike, especially over an old roof—a nail might have no holding power in a designated spot. Defendant produced no third party, in the way of an experienced roofer, to testify that in his opinion the roof was not properly nailed, nor did the defendant take a definite stand in the first place on this matter of nailing as it doubtless would have done had it thought the nailing seriously defective throughout. Not to have taken a definite stand under such circumstances was to court further trouble.

Moreover, the witness, G. E. Cartier, who might be said to have represented both parties (manufacturer and roofer), since he or his company acted as jobber or intermediary between the defendant and the roofer in supplying the shingles, etc., testified that the trouble was due to a weakness in the shingles (Transcript 50-51, 76-77). And see testimony of Weigand as to condition of shingles, (Transcript pp. 94-95).

There is some dispute in this case as to the meaning of the term "tensile strength." There is no evidence to show that it has any special significance or meaning in the shingle trade, hence it may perhaps be best taken in an every day sense, and so taken doubtless means an ability to resist tearing apart, briefly, tenacity, or an ability to resist rupture. There can be no doubt that a shingle should possess sufficient tenacity to resist any reasonable strain applied in the way likely to be encountered in actual use, from wind, rain and storms generally. In the present case there is testimony showing the shingles were far from tenacious in use (Transcript p. 94-95).

It would appear, therefore, that decision should be for the plaintiff, the

remaining question being as to the amount or damages.

A fair consideration of the guarantees as a whole warrants holding the defendant liable only for damages confined to the roof. It is unreasonable, if not impossible, to agree with plaintiff's contention that defendant expressly guaranteed against improper workmanship in the laying of the shingles. At the most defendant would only be expected to guarantee against defects in workmanship or materials in the shingles themselves; it was not a roofer but simply a manufacturer.

As to the term "roof results" used in the second guarantee, and about which there was some argument, it appears to have been used through a clerical error of Mr. Scharawath's stenographer, and if it can be interpreted doubtless means results to roof. Otherwise the term might have been house results. If the term as used is not to be limited to the roof, it might well include even the cellar, and even plaintiff does not go this far (Transcript p. 170).

Furthermore, as to damages to other than the roof, it is evident that plaintiff did not at first think of charging many of these items to defendant (Transcript pp. 177-178) and did not in fact bring them to defendant's attention until late in March, 1923, (Transcript p. 183). This is inconsistent with his present claim that defendant should pay for them. As defendant says in its brief, the plaintiff could not see all these difficulties and rest upon his oars without notifying defendant. Affirmative action was called for.

Plaintiff eventually had his house reshingled, using for the purpose another make of artificial shingle, and while there is some testimony to the effect that the shingle so used was of another grade and kind (a more expensive type) from that originally contracted for (Transcript pp. 95,

220), still it would appear that the plaintiff did the best he could under all the circumstances. He had met with considerable trouble, over quite a period, in connection with this shingling matter and was doubtless anxious, and reasonably so, to get his roof fixed right and have the matter done with. It might have been unfair if plaintiff had only contracted for a wooden shingle and had reshingled with slate and expected the defendant to pay for that, but artificial shingles are a comparatively recent product and it is doubtful if the average person or layman can readily classify or differentiate between them. Plaintiff was entitled to a good roof, perhaps one might say a twenty year roof, and if he eventually secured it, then it does not seem too much to award him the cost of it, particularly as on all the evidence it can not be said that such cost was obviously excessive or unreasonable.

Plaintiff asks $531.38, the cost, for the new roof, and decision is accordingly given for him in that amount, together with interest thereon from the date of the writ.

For Plaintiff: William J. Brown.

For Defendant: Edward C. Stiness, Daniel H. Morrissey & Francis J. O'Brien.